Hart L. Robinovitch, AZ Bar No. 020910
ZIMMERMAN REED LLP
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ  85254
(480) 348-6400 Telephone
(480) 348-6415 Facsimile
hart.robinovitch@zimmreed.com

Daniel E. Gustafson (#202241)
Karla M. Gluek (#238399)
Amanda M. Williams (#341691)
Daniel J. Nordin (#392393)
**GUSTAFSON GLUEK PLLC** Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN  55402
Tel: (612) 333-8844
dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
awilliams@gustafsongluek.com
dnordin@gustafsongluek.com

*Attorneys for Plaintiffs and*
*Proposed Class*

*(Additional counsel listed below)*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| ELEANOR and ROCCO CIOFOLETTI, and LARRY STOSPAL on behalf of themselves and all others similarly situated, | CASE NO.: |
| Plaintiffs, | |
| -vs- | **CLASS ACTION COMPLAINT** |
| THE QUANTUM GROUP USA, LLC, | |
| Defendant. | Jury Trial Demanded |

Eleanor Ciofoletti, Rocco Ciofoletti, and Larry Stospal ("Plaintiffs"), on behalf of themselves and all others similarly situated, by their attorneys, Squitieri & Fearon, LLP,

1

Wexler Wallace LLP, Gustafson Gluek PLLC, and Zimmerman Reed LLP bring this Class Action Complaint against Defendant Quantum Group USA, LLC ("Quantum"), as successor-in-interest to Shurwest LLC ("Shurwest"), based upon investigation of counsel and Plaintiffs' information and belief:

## I.   INTRODUCTION

1.      This is an action to recover damages on behalf of Plaintiffs and members of the proposed class, defined below (the "Class"), who purchased Minnesota Life Insurance Company ("MLIC") or Securian Life Insurance Company ("SLIC") indexed universal life insurance policies ("IUL") issued through Securian Financial Group, Inc.'s life insurance subsidiaries network of agents and brokers who became SLIC and/or MLIC agents through Shurwest, LLC (the "Shurwest Broker Network").

2.      Shurwest marketed and sold the MLIC and SLIC life insurance policies "linked to" in Securian own words) structured cash flow products from Future Income Payments, LLC (or its subsidiaries) ("FIP" and "FIP Products") to be purchased by class members. The FIP Products were marketed by Shurwest, through the Shurwest Broker Network, as a premium financing device to class members to be purchased in combination with the SLIC and MLIC IUL policies. Shurwest procured the FIP products for said brokers and agents to sell to class members as part of Shurwest's roles as a Securian "Master Broker General Agent" and "Broker" pursuant to written contracts.

3.      As early as 2015, State regulatory agencies had investigated the FIP Products and determined them to constitute illegal usurious loans. Shurwest, however, continued to sell FIP Products in conjunction with Securian IUL products through 2018, by which time over 20 states had determined that FIP products were unlawful loan products. When FIP ceased operations in mid-2018 as a result, Plaintiffs and the Class not only lost their investments in FIP Products, but also lost or were at risk of losing the life insurance policies purchased through the Securian Financial Network because, without the cash flows from the FIP Products, they could no longer

CLASS ACTION COMPLAINT

pay for them or had to pay from sources other than the FIP products which were marketed and sold to them as premium finance investments.

4.     Plaintiffs bring this action as a class action on behalf of themselves and all similarly affected purchasers of the IUL policies through the Shurwest Broker Network who purchased FIP products linked to MLIC/SLIC IUL policies, to recover the millions of dollars in premiums paid, plus monies lost by Class members in the FIP Products illegal loan scheme.

5.     Defendant Quantum is the successor-in-interest to Shurwest having taken over all the operations of Shurwest, LLC which is, for the present, the debtor in possession under a Chapter 11 proceeding, *In re Shurwest, LLC*, U.S. Bk. Ct., D. Az., No. 2:21-bk-06723-DPC. Quantum is therefore liable to Plaintiffs and the class under the doctrine of de facto merger for the acts of Shurwest LLC. Quantum was created by Shurwest's controlling persons to shift Shurwest's operation and assets to Quantum and to attempt to escape liability for Shurwest's liabilities, accordingly, its creation and transfer of assets and operations is a fraudulent transaction.

## II.     JURISDICTION AND VENUE

6.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(d) and 28 U.S.C. 1367 because the sum or value of the claims in this case, exclusive of interest and costs, exceeds $5,000,000 and Plaintiffs and members of the Class are citizens of states different than the Defendant.

7.     The claims arose in this District because Shurwest conducted the de facto merger in this District. Shurwest and Quantum are based in Arizona. As such, the unlawful conduct alleged herein originated in, and arose out of, this District. Venue in the District of Arizona is therefore proper pursuant to 28 U.S.C. § 1391(a) and (b) and 18 U.S.C. 1965(a) and (b).

8.     This Court has personal jurisdiction over Defendant as a result of acts of Defendant occurring in this State and its operations here.

CLASS ACTION COMPLAINT

III.   **PARTIES**

9.     Plaintiffs Eleanor and Rocco Ciofoletti ("Ciofoletti") are residents of the state of South Carolina. In or about late 2016 the Ciofolettis' purchased an Indexed Universal Life Policy from a "broker" in the Shurwest Broker Network who was also in Securian's own approved network of agents and brokers (the Securian Financial Network). The brokers in the Shurwest Broker Network relevant to this class action were all also in the Securian Financial Network. In conjunction with the sale of the policy, the Ciofolettis' were solicited to purchase the FIP Product as a premium finance vehicle (which was actually an illegal loan) promoted, offered, and sold by Shurwest. Ciofoletti has accepted MLIC's offer of rescission and return of premiums but neither Ciofoletti has released any claims against Shurwest or Securian or Defendant herein.

10.     Plaintiff Larry Stospal ("Stospal") is a resident of the state of Texas. In or about late 2016 Stospal purchased from a broker in the Shurwest Broker Network who was also in Securian's own approved network of agents and brokers. In conjunction with the sale of the policy, Stospal was solicited to purchase the FIP product as a premium finance vehicle (which was actually an illegal loan) promoted, offered, and sold by Shurwest. Stospal has accepted MLIC's offer of rescission and return of premium but has not released any claims against Shurwest or Securian or Defendant.

11.     Defendant The Quantum Group, USA, LLC ("Quantum") is an Arizona limited liability company, doing business in Scottsdale, Arizona.

12.     On information and belief, Quantum's members are: Quantum Holding Company, Inc., an Arizona corporation with its principal place of business in Scottsdale, Arizona, KT Equity Partners III, LLC a Topeka, Kansas LLC whose members, on information and belief, are all citizens of Kansas, and RLS Capital Holdings, LLLP, a Nevada limited liability limited partnership whose general partner is Shurts Management Company, LLC, an Arizona LLC

CLASS ACTION COMPLAINT

whose members are Ron Shurts who resides in Scottsdale, Arizona and the Ronald L. Shurts Living Trust, which is located in Scottsdale, Arizona.

13.     Quantum was formed on November 12, 2018. Shurwest began to rebrand itself as Quantum in February 2019. On information and belief, Quantum occupies the same office space as Shurwest, employs the same employees as Shurwest, is managed by the same directors and officers as Shurwest, offers all of the services Shurwest offers, and was set up as a successor entity to Shurwest.

14.     At all material times herein mentioned, Quantum was the alter ego of Shurwest.

15.     Alternatively at all material times herein mentioned, Quantum was the successor-in-interest to Shurwest and is liable for Shurwest's wrongdoing through the equitable doctrine of de facto merger. Shurwest's business continued as Quantum, with the same employees, directors, officers, business offices, telephones, and computers as Shurwest used in its business dealings with Minnesota Life. Quantum's creation was a fraudulent transaction, done in order to escape liability for Shurwest's obligations.

16.     Relevant Non-Party Defendant, Shurwest LLC is an Arizona limited liability company. Shurwest was at all relevant times a "Master Brokerage General Agent" and "Broker" pursuant to contracts with MLIC and SLIC throughout the Class Period. It is currently in Chapter 11, in the United States Bankruptcy Court of the District of Arizona.

## IV.     CLASS ACTION ALLEGATIONS

17.     The action is brought and may properly be maintained as a class action pursuant to Rules 23(a), 23(b)(1)(b), (b)(2) or 23(b)(3) of the Federal Rules of Civil Procedure.

18.     This suit is brought on behalf of a Class consisting of and defined as all purchasers of the SLIC and MLIC IUL insurance policies purchased in combination with FIP Products from 2012 through the present sold through the Shurwest Broker Network.

19.     Excluded from the Class are any member of the Securian Financial Network, Shurwest Broker Network and/or Quantum, any entity in which Quantum has a controlling

interest, and the officers, directors, legal representatives, heirs, successors, subsidiaries and/or assigns of Defendant or Shurwest.

20.     The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, are impractical. Plaintiffs are informed and believe that there are at least hundreds of proposed Class members geographically dispersed across the United States.

21.     MLIC has admitted in its lawsuit against Shurwest LLC that it has "identified 274 Minnesota Life IUL policies sold through Shurwest between 2004 and early 2018 <u>linked to an investment in FIP</u>." (Emphasis supplied)

22.     The number of class members who have claims against Shurwest and who are not represented by other counsel is (274-143) =131. Securian has returned premiums to all but 52 of the 274 FIP the class members (the "52"). The 52 can assert premium claims against Shurwest <u>and</u> FIP losses. The approximately 43 class members who received returns of premium are only here to assert FIP loss claims against Shurwest.

23.     There are numerous questions of law and fact common to Plaintiffs and the Class, including:

      a.     whether Quantum is liable for Shurwest's own breach of fiduciary duties and/or for aiding and abetting of MLIC and SLIC's breach of fiduciary duties owed to Plaintiffs and class members by, inter alia, participating (directly or through their agents and brokers) in the promotion, distribution, and sale of illegal FIP Products as premium financing vehicles for MLIC and SLIC IUL products;

      b.     whether Quantum is liable to Plaintiffs and the class for Shurwest's promoting and offering and selling FIP products directly and/or indirectly to Plaintiffs and the class;

CLASS ACTION COMPLAINT

c.    whether Shurwest substantially assisted MLIC's and SLIC's breach of fiduciary duties owed to Plaintiffs and class members and thereby aided and abetted fiduciary breaches.

d.    whether Quantum is liable for any of Shurwest's liability for the acts and/or omissions of Shurwest respective brokers and agents;

e.    whether Quantum is liable to Plaintiffs and the Class who suffered monetary damages as a result of the Shurwest fiduciary breaches, participation in FIP's illegal loan scheme, and other wrongful conduct; and

f.    the proper measure of damages.

24.    Plaintiffs' claims are typical of the claims of the members of the Class, and they are members of the Class described herein.

25.    Plaintiffs are willing and prepared to serve the proposed Class in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to, or which conflict with, the interests of other members of the Class.

26.    Plaintiffs' interests are co-extensive with and not antagonistic to those of the absent Class members. Plaintiffs will undertake to represent and protect the interests of absent Class members.

27.    Plaintiffs have engaged the services of counsel who are experienced in complex class action litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent Class members.

28.    The questions of law and fact common to the Class, as summarized above, predominate over any questions affecting only individual members, in satisfaction of Rule 23(b)(3).

CLASS ACTION COMPLAINT

29.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Compared to the hundreds of individual actions, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

30.     Rule 23(b)(1)(B) certification is appropriate because this is a classic limited funds case.

31.     Quantum has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

32.     A class action is superior to other available methods for the adjudication of this controversy. Individualized litigation increases the delay and expense to all parties and the court system given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be more far more fair, efficient, and economical as a class action maintained in this forum than in piecemeal individual determinations.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Shurwest's Role

33.     Shurwest was a broker and "Master Brokerage General Agent" for both MLIC and SLIC pursuant to contracts with each. Shurwest was, upon information and belief a member of the Securian Financial Network. Shurwest marketed, promoted, and sold life insurance products and FIP Products to insureds through the Shurwest Broker Network and assisted and directed members of the Securian Financial Network in the marketing, promotion, and sale of life insurance policies.

34.     Shurwest also served as an Independent Marketing Organization ("IMO") to the Shurwest Broker Network. As one court explained the function of IMOs:

> Insurance companies generally do not recruit independent insurance agents to sell their products. Instead, IMOs recruit independent

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> insurance agents to sell [fixed index annuities] and other types of insurance products to the independent agents' clients. An IMO serves as a third-party intermediary between the agents and the insurance companies, providing product education, marketing, and distribution services. Insurance companies generally compensate IMOs for their support services based on a percentage of agent sales volume.

*Mkt. Synergy Group, Inc. v. United States Dep't of Labor*, 16-CV-4083-DDC-KGS, 2016 WL 6948061, at *3 (D. Kan. Nov. 28, 2016).

35.   In its IMO role to *inter alia*, the Shurwest Broker Network, Shurwest promotes itself as follows:

> PROPRIETARY SOLUTIONS
> Shurwest gives you access to a complete array of insurance carriers offering the most advances . . . indexed universal life insurance strategies available today. By choosing us as your partner you also gain access to patented limited distribution solutions that set you apart from your competition.
> EDUCATION AND TRAINING
> • Webinars
> • Onsite visits to come to meet our team
> • Personal coaching
> • Peer to peer idea sharing

(http:/shurwest.com/advisor-services# proprietary solutions last accessed November 4, 2019, 10:30 pm.)

36.   Under its agreements with SLIC and MLIC, Shurwest was authorized to recommend to SLIC and MLIC "producers" who SLIC and/or MLIC should appoint to be their agents. These producers became the Shurwest Broker Network. Shurwest was also authorized under broker and agent agreements with Securian to "provide service" to "product owners" of SLIC and MLIC "products."   The services Shurwest provided to "product owners" (*i.e.*, the Plaintiffs and class members) included premium finance products and services. Shurwest provided education, marketing, and distribution services to both agents and brokers in the Shurwest Broker Network and the Securian Financial Network and others. When insurance brokers and/or financial advisers who used Shurwest's services sold a Securian product, Securian paid a portion of the commissions to Shurwest pursuant to the agreements. Likewise, when Shurwest employees sold FIP Products they received commissions from FIP.

9

37.     Under the Master Brokerage General Agent ("MBGA") Agreements with MLIC and SLIC, Shurwest contracted to perform "the following activities" (in relevant part):

> 1.2 . . .
>> (a) Supervise, insofar as possible, Your Brokers to ensure that they:
>>> * * *
>>> 4.      Comply with all applicable insurance laws and regulations governing the sales and servicing of our products
>>> * * *
>> (b) Review all applications before submitting them to US . . . and submit only those applications that have been properly completed. . .
>
>> 4.11    Anti-Money/Laundering:   You shall comply and require your brokers to comply with our anti-money laundering policy and if requested You and Your Brokers shall assist in satisfying Our   obligations under   our   anti-money laundering policy.

38.     Shurwest also entered into Broker Sales Contracts with each of MLIC and SLIC.

39.     Shurwest, at all times acted within the scope of the agent and broker agreements referred to above with the actual or apparent authority of Securian, and its actions relative to the FIP Products described below were known or should have been known to Securian.

**B.      Quantum Is Shurwest's Alter Ego/Successor-In-Interest**

40.     On September 12, 2018, Articles of Incorporation were filed with the Arizona Corporation Commission on behalf of a new entity, The Quantum Group, USA, LLC, (9.12.18 Quantum Articles of Incorporation). Quantum and Shurwest are controlled by the same people and entities. Jim Maschek was the statutory agent and organizer of Quantum and the address for both he and Quantum was 17550 N. Perimeter Driver, Suite 300, Scottsdale, AZ, 85255. *Id*. Also doing business at same address, Shurwest.

41.     On October 2, 2018, Shurwest, LLC filed a Trademark/Service Mark Application with the United States Patent and Trademark Office for the "The Quantum Group" mark. Around the same time, Shurwest registered for the domain name "thequantumgroup.com." A Quantum Facebook page was also created in October 2018.

CLASS ACTION COMPLAINT

42.     A few months after The Quantum Group was formed, Shurwest began "rebranding" itself as Quantum. In February 2019, a representative of Securian Financial (Minnesota Life) called and learned that "Shurwest is **rebranding the firm** as Quantum." The Securian representative then e-mailed several colleagues "so that there is no confusion as to who Quantum is" and said that "they just started to answer the phones this way today and are just beginning to roll out the changes." *Id*. A month later, Ron Shurts referred to Shurwest/Quantum as a single entity in an e-mail with Securian about establishing a fund to deal with Minnesota Life chargebacks. Shurts copied Shurwest Controller Tony Avalos on the e-mail at Mr. Avalos' shurwest.com e-mail address. Mr. Avalos is the Financial Controller at Quantum and in the very same e-mail thread, his e-mail address changes from [tavalos@shurwest.com](mailto:tavalos@shurwest.com) to [tavalos@thequantum.com](mailto:tavalos@thequantum.com), although this email signature still identified him as Shurwest's Controller.  *Id*. Th same month, Marc Lindsay, the VP of Advisor Development, e-mailed a Shurwest client **"ANNOUNCING. . .SOMETHING BIG."** (Emphasis in original). The big announcement WAS: "[i]t's official we are now Quantum" and the "rebrand is almost complete." *Id*.

43.     In addition to forming Quantum and rebranding itself as Quantum, Shurwest also transferred substantial tangible and intangible assets to Quantum or for Quantum's benefit. Discovery in the underlying lawsuits has not shown that Quantum received any consideration for these asset transfers.

44.     The assets that Shurwest transferred to Quantum or for Quantum's benefit include all or nearly all the individuals, including management, who were employed by Shurwest when Quantum was formed. Based on discovery in the underlying lawsuits, it appears that Quantum has never had its own employees. Instead, all, or nearly all, the people that have performed work for Quantum, were employed by Shurwest when Quantum was formed.

CLASS ACTION COMPLAINT

45.     Shurwest also apparently transferred to Quantum its contractual rights and authority with other insurers, as well as agents in Shurwest's downline who were appointed by those insurers.

46.     Shurwest executed a Trademark Assignment that assigned "the entire business to which the Trademark Rights pertain, including all right, title and interest in and to the trademarks together with the goodwill of the business connected with and symbolized by the trademarks." There is no indication or evidence that Quantum paid any consideration to Shurwest for this assignment.

47.     Prior to the formation of Quantum, Shurwest apparently offered website hosting services to agents and their firms and billed them monthly for those services. In August 2019, Farmer and Associates received an e-mail that explained because of the "operational ramp up of Quantum" the firm had to provide a new credit card authorization so that Quantum could bill for automatic monthly website hosting payments that were originally set up with Shurwest. Discovery in the underlying lawsuit has produced no evidence that Shurwest received any consideration for transferring those assets to Quantum. The very same e-mail claimed that Quantum was "2017 & 2018 Best Distributor Award Winner-SRP Awards" even though Quantum did not exist before November 2018.

**C.**     **Securian Is a Fiduciary to Plaintiffs and Class Members Because Of Its Use Of "Financial Advisors" In the Securian Financial Network to Advise Insured with Respect to IUL For Fees Embedded in the Policy Premiums**

48.     Securian's website page entitled "Universal Life Insurance" (securian.com/products-services/life-insurance/universal-life-insurance.html (As of 10:24 a.m. cst.11/6/2019) acknowledges that its IUL products are complicated financial instruments for which insureds will require the services of financial advisors. It states:

> Types of universal life insurance. What type is right for you? If you and your financial advisor determine universal life insurance is a good choice, Securian offers three variations to choose from – fixed, indexed and variable.

CLASS ACTION COMPLAINT

> The main difference between the products is the risk/return associated with their cash value growth potential. When choosing the ideal product for your needs, you and your advisor should consider your level of risk tolerance.

49.    In its website page specifically referencing "Indexed universal life," Securian invites visitors to "Ask a professional." "A financial advisor can help you analyze your needs and help you choose the insurance that's rights for you." The site contains a "live" box labeled, "Find an advisor," which when clicked directs a visitor to a member of the Securian Financial Network who, as relevant to class members here, was also a member of the Shurwest Broker Network.

50.    The Securian Financial Network is in the business of marketing, brokering, and/or selling insurance policies of various types, including IUL policies indexed to stock market investments. The MLIC and SLIC are issuers of such policies, while Shurwest markets, promotes, and sells policies to both consumers and insurance professionals.

51.    Securian employs financial professionals who determine/oversee/allocate investment allocations and returns for IUL policyholders. The costs of those professionals are paid in part from fees embedded in premiums paid by policyholders. Securian thus earns revenues from providing financial services as does Shurwest.

52.    Indexed Universal Life insurance policies such as those which are the subject of this action are complex financial instruments described by Annexus, a Shurwest affiliate, at its website, as follows:

> **What is IUL?**
>
> Indexed Universal Life Insurance is a form of permanent life insurance that provides a tax-free death benefit upon your death. It also offers tax-advantaged cash value growth you can access throughout your life. Your cash value earns interest based on the positive performance of an underlying stock market index like the S&P 500. Interest would be credited at the end of an index segment (or term), with common segments of a 1-year, 2-years or up to 5-years. If the index performance is negative during any segment, your cash value is protected from any negative market return.

53.    Similarly, Securian describes IUL products as follows:

> **Balancing risk and cash value growth**

> Indexed universal life insurance offers cash value growth that is tied to the movement of an underlying index but does not participate in the market.
>
> Minimum and maximum interest crediting limits act as guardrails, which make indexed universal life less risky than variable universal life insurance, while potentially producing greater interest crediting than fixed universal life insurance.

54. Not surprisingly, in its website page the Securian invites, encourages, and facilitates insureds' use of Securian Financial Network financial advisers in the purchase of IUL policies as alleged in more detail hereinafter.

**D.    <u>The Broker/Agent Networks</u>**

55. At all times relevant, the indexed life insurance policies were sold through "advisors" in the Shurwest Broker Network, who were also in the Securian Financial Network.

56. Securian has publicly stated: Securian Financial Network, the marketing name for the sales and distribution arm of Securian Financial Group, Inc., its subsidiaries, and affiliates, is a nationwide network of financial services firms. Products and services are offered and sold only by appropriately licensed entities and financial representatives."   Securian touted the Securian Financial Network as a "long-term resource to provide expertise and create strategies to help you and your family achieve your financial goals."   Its advisors "support your everyday moments and major milestones and approach your finances from a holistic standpoint." According to the Securian website, an advisor in the Securian Financial Network:

- listens to your goals, visions, dreams – and even your fears
- analyzes financial resources and opportunities
- devises a roadmap to help you reach your goals

57. Securian further represented in its website:
At Securian Financial, we equip our financial advisors with suitable choices to serve clients and their unique situations. Our advisors

14

**CLASS ACTION COMPLAINT**

offer a range of life insurance, annuities and wealth management solutions to help you put family first.

* * *

With access to a network of more than 1,100 registered financial advisors, building your secure tomorrow is just a click away.

58.     Securian also, on its website, also boasted: "[we] serve nearly 19 million customers through 5300 employees and representatives."

### E.     The FIP Illegal Loan Scheme

59.     From 2012 through 2018, FIP engaged in an illegal loan scheme that involved FIP's "purchase" of a portion of a consumer's future pension stream at a "discount" in exchange for providing the consumer with a lump sum payment ("purchase transaction"). The consumer was obligated to repay FIP through a series of monthly payments. In the aggregate, that series of payments always exceeded the amount of the lump sum received by the consumer. FIP represented to the consumer, among other things, that (i) these lump-sum payments were not "loans," (ii) there was no applicable interest rate, and (iii) the cost of the lump-sum advance was less than that of potential alternative sources of funds, such as credit cards.

60.     FIP Products were agreements through which FIP provided monthly income streams sold to "investors" such as Plaintiffs and class members.

61.     FIP products were, in fact, illegal usurious loans. By 2015, both New York and California had barred FIP products from sale to their respective state residents. FIP misrepresented material aspects of the purchase transactions and engaged in deceptive acts and practices as well as other violations of federal consumer financial law, leading to its shutdown and placement in receivership.

### F.     Shurwest's Participation in the FIP Scheme Helps Life Policy Sales

62.     FIP products were sold to class members by financial advisors including Shurwest and its employees. *Bureau of Consumer Financial Protection v. Future Income Payments, LLC et al.* (C.D. Cal.), Case No. 8:18-cv-01654, Complaint ¶ 45.

63.     To offer MLIC and SLIC life insurance policies financed by FIP Products, Shurwest Broker Network brokers and agents signed broker agreements with MLIC or SLIC wherein Shurwest was the Master Broker Agent. Among other things, those agreements required the agents and brokers to remit policy applications and initial premiums to Shurwest, which in turn forwarded them to Securian. At all relevant times, Shurwest Broker Network acted within the scope their respective agency agreements with Shurwest and Securian, with the actual or apparent authority of both Shurwest and Securian.

64.     Under its own practices, and policies, Securian allowed only brokers under contract to MLIC or SLIC to market and offer IUL products to insureds.

65.     Shurwest marketed the FIP Products to its Shurwest Broker Network, who were also MLIC and SLIC brokers, at conferences, webinars, and face to face meetings to be sold in combination with Securian's IUL Policies. In its capacity as Securian's agent and/or broker, Shurwest marketed FIP Products as one of many investment products available for brokers to sell to Plaintiffs and class members.

66.     When Shurwest began to sell FIP products in or about early 2016, it was just a continuation of Shurwest's "IRA Reboot Strategy" which Shurwest had marketed since at least early 2014.

67.     The FIP premium funding strategy (IRA Reboot with FIP) Shurwest pitched to certain Shurwest-affiliated agents involved converting taxable assets to a tax advantaged vehicle over a period of time, by "turbocharging" the IUL product through the use of a "structured cash flow" in order to facilitate a more aggressive funding strategy. Class members were saddled with tax bills when funds were withdrawn through the IRA Reboot.

68.     Shurwest's National Sales Director of Life Insurance, employee Melanie Schultz-Miller, immediately recognized the profit potential to Shurwest. Miller, in an email to Shurwest's President on April 6, 2016, wrote about using FIP product to fund a life policy:

CLASS ACTION COMPLAINT

"So…better for us, . . . and it actually creates a larger life [policy] because the premiums are even higher (so extra better for us)."

69.     Miller and Shurwest promoted and trained the Shurwest Broker Network in the use of structured cash flow products, which is what the FIP product was. Shurwest distributed to the Shurwest Broker Network a "structured Cash Flow Order of Operations."

70.     A California Superior Court Judge after hearing evidence said Shurwest's "rogue employee" defense, was "not credible in light of the overwhelming evidence that Shurwest was aware of the use of FIP to fund higher levels of IUL, that its employees did so as part of their employment with Shurwest (via Shurwest email, with Shurwest resources and training) and that Shurwest ultimately profited off these increased IUL amounts." *Leland v. Brown*, Case No. CV 1900627 (June 24, 2020, Cal. Sup. Ct., Marin Cnty. Order Denying Defendant Shurwest LLC's Motion To Quash Service of Summons for lack of Personal Jurisdiction."[1]

71.     The IRA Reboot plus FIP product sales was a spectacular sales success for Shurwest: in 2017, its revenues grew almost 7% from 2016; in 2018 Shurwest's revenue grew to $21.1 million an almost 40% increase from 2015, phenomenal growth considering that Shurwest's FIP business came to a screeching halt in April 2018 when FIP collapsed.

72.     Shurwest employees introduced brokers/advisers, including the Shurwest Broker Network to the FIP Products during meetings at the Shurwest's corporate headquarters and/or conferences held nearby. At these events, Shurwest specifically pitched the FIP Products to agents, brokers, and employees as a means of funding life insurance policies issued by Securian. The Shurwest employees conducting these meetings and otherwise pitching FIP Products in conjunction with the sale of the Securian's life insurance policies, were at all times acting within the scope of their employment with Shurwest, with the actual or apparent authority

---

[1]     Other courts have determined that this situation was not of a "rouge" employee.  *See Order Denying Shurwest, LLC's Motion to Dismiss, Billings, et al. v. Dixon, et al.*, Case No. 2019-CP-04-00479, *See Order Denying Shurwest, LLC's Motion to Dismiss, Burgess v. Storer, et al.*, Case No. 2018-CP-23-04197; *See Order Denying Shurwest, LLC's Motion to Dismiss, Stegelin, et al. v. Dixon, et al.*, Case No. 2019-CP-40-00507.

**CLASS ACTION COMPLAINT**

of Shurwest, and their actions relative to the FIP Products were known or should have been known to Shurwest.

73.     Shurwest employees recommended and facilitated the use of the FIP Products as premium financing vehicles as safe and reliable products that would provide a consistent stream of income that would fund the payment of the Securian life insurance policies.

74.     One of the conferences sponsored by Shurwest took place in early March 2017. At that conference, Shurwest marketed the use of FIP Products to fund the purchase of MLIC and SLIC universal life insurance policies.

75.     Shurwest employees trained Shurwest-affiliated agents who were also part of the Securian Financial Network on the FIP premium funding strategy—specifically, on the use of FIP "structured cash flows" in conjunction with Minnesota Life IUL policies— and provided them with webinars and sales materials to help present the strategy to clients.

76.     Shurwest communicated with and directed Shurwest Broker Network agents and brokers in effectuating the transactions, and accepted and transferred to Securian, Plaintiffs' and Class members' premium payments for the insurance policies in connection with those transactions.

77.     Using the misinformation provided to them by Shurwest and acquiesced in by Securian, the Shurwest Broker Network agents and brokers sold FIP Products to Plaintiffs and the Class to finance the premiums for life insurance policies issued by Securian and structured the sales so that the payment stream from the FIP would be used to pay Securian for the life insurance policies.

78.     According to published reports, approximately 370 financial advisors in the Shurwest Broker Network put their clients in FIP Products and steered those clients to utilize the FIP monthly payments to fund insurance products such as Securian's indexed life insurance policies.

79.     In or about April 2018, FIP ceased making payments to income stream purchasers, i.e., Plaintiffs and Class members. As a result, Plaintiffs and the Class could no longer fund the life insurance policies sold to them by Shurwest. Consequently, Plaintiffs and other Class members suffered the lapse of their policies, incurred surrender charges and other penalties, and had paid for policies which never accumulated enough value to provide the Plaintiffs and Class members with a source of retirement income, the objective of the life insurance policy purchase. At the same time, Plaintiffs and Class members lost whatever they had paid to FIP, which was supposed to – but did not -- yield a steady stream of cash flows that would have funded the life insurance now lapsed.

**G.     Shurwest And Securian Had Actual and Constructive Notice of the FIP Scheme**

80.     Shurwest had actual and constructive knowledge of the illegal FIP loan scheme.

81.     Indeed, Shurwest claimed it had vetted the FIP Products, and it was also responsible for structuring the FIP Products and facilitating the use of the FIP Products for the purchase of Securian life insurance policies.

82.     Furthermore, Securian knew or should have known of FIP's illegal loan scheme by the presence of Securian high-ranking employees at Shurwest events promoting the scheme as a means of funding life insurance premiums, as well as through reports of actions by state regulatory agencies' enforcement actions against FIP and its convicted felon founder Scott Kohn. In addition, Securian had a legal obligation under the USA Patriot Act and/or the Bank Secrecy Act to be aware that the Shurwest Broker Network was utilizing the FIP illegal loan scheme to finance the purchase of life insurance policies issued by Securian. Finally, the Securian and Shurwest had ample opportunity and ability to bar agents and brokers from using the FIP illegal loan scheme to finance life insurance policy purchases by Plaintiffs and Class members.

CLASS ACTION COMPLAINT

83.     FIP has been the subject of state regulatory investigations since 2014, with various states including New York, alleging that FIP's business model was an illegal scheme.

84.     Numerous other state and local regulators and agencies also have ordered FIP to cease its operations. These agencies include the California Department of Business Oversight; the Los Angeles City Attorney's Office; the Minnesota Attorney General; the Colorado Attorney General; the Massachusetts Attorney General; the North Carolina Attorney General; the Iowa Attorney General; the Virginia Attorney General; the Oregon Attorney General; the Oregon Department of Consumer and Business Services; the Illinois Attorney General; the Illinois Department of Financial and Professional Regulation; the Maryland Attorney General; the Maryland Commissioner of Financial Regulation; the Pennsylvania Department of Banking and Securities; the New York State Department of Financial Services; and the State of Washington Department of Financial Institutions.

85.     In mid-2017, Minnesota Attorney General Lori Swanson filed a lawsuit against FIP and a subsidiary alleging that FIP was making illegal loans disguised as purchases of pensions which obligated the borrowers ("sellers" of pension rights) to repay the loans, termed "purchases," at effective rates of 240% and at average rates of 139% annually.

86.     Securian also would have acquired knowledge of FIP illegal activities through Securian's procedures to ensure compliance with various federal anti-money laundering rules and regulations. Insurers who issue "covered products" such as Securian are subject to compliance and reporting requirements of the USA Patriot Act. The "covered products" include life insurance products with cash value or investment features and/or non-group annuity contracts. Under these regulations, each insurance company must develop and implement a risk-based anti-money laundering ("AML") policy reasonably designed to prevent the company from being used to facilitate money laundering "and other financial crimes associated with the insurance company's products."

87.     The scope and objective of these AML laws is not limited to money laundering or terrorist financing only. In or about 2005, Director of Financial Crimes Enforcement Network ("FinCEN") William J. Fox announced:

> These rules represent key steps in ensuring that the Bank Secrecy Act is applied appropriately to these businesses and in protecting the insurance industry from potential abuse by those seeking to launder money or finance terrorism or other illicit activity.

88.     Also, according to regulators, the insurer's AML program must encompass the activities of agents or brokers who sell "covered products" because "insurance agents and` brokers are an integral part of the insurance industry due to their direct contact with customers" and therefore the insurer's AML "policies, procedures and internal controls" must be designed "to integrate its agents and brokers into its anti-money laundering program and to monitor their performance with its program."

89.     SLIC and MLIC agent and broker contracts with Shurwest required Shurwest to comply with AML Laws and to assist MLIC and SLIC's compliance therewith.

90.     In early 2012, FinCEN and the National Association of Insurance Commissioners ("NAIC") reached an agreement to incorporate the initial BSA/AML examination within the regulatory examinations performed by the Department of Insurance of each company's domiciliary state. NAIC Financial Condition Examination Handbook 2012, Section 1.c., pp. 98–101.

91.     The United States Treasury Department's "bottom line" was explained in its "Frequently Asked Questions," Anti Money Laundering Program and Suspicious Activity Reporting Requirements for Insurance Companies":

> Under the Bank Secrecy Act, financial institutions are required to identify assess, and mitigate risk that their businesses will be abused by criminals.

92.     Accordingly, MLIC and SLIC were legally mandated to monitor their own activities as well as those of the Shurwest Broker Network to prevent FIP's and broker/agent's promotion of financial crimes utilizing Defendants' products.

93.     Although Securian and Shurwest had actual and constructive knowledge of the illegal FIP loan scheme, members of the Shurwest Broker Network who were involved in the sales process were assured by Shurwest employees that FIP Products were appropriate for the insureds who were purchasing ILU products. Securian explicitly or implicitly granted Shurwest authority to promote FIP products as a premium financing vehicle for MILC and SLIC IUL policies. It did so by attending and participating in Shurwest orchestrated webinars and conferences at which (a) FIP products were promoted and (b) Securian's representatives spoke about premium financing vehicles and advantages.

## VI.   CAUSE OF ACTION

### (Alter Ego/Successor Liability of Quantum for Shurwest's
### Aiding and Abetting of Securian's Fiduciary Breaches And/Or
### Shurwest's Fiduciary Breaches)

94.     Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

95.     Securian was a fiduciary to Plaintiffs and class members. Shurwest was fiduciary to Plaintiffs and class members.

96.     Securian promotes itself and its Network as "financial advisors" which offer financial advice to clients in connection with sale of MLIC and SLIC policies. These financial advisors, promoted by Securian as part of its financial network, sold to Plaintiffs and the Class MLIC and SLIC IUL policies financed by the FIP investment – an investment only available through Shurwest. These transactions were not simply sales of life insurance. The MLIC and SLIC IUL policies were sold with the FIP investment as part of a purported financial planning vehicle. Securian received compensation for its financial services and financial advisor's

financial advice in selling these FIP funded IUL policies. As discussed above, part of the Plaintiffs' and Class Members' premium payments paid the costs associated with Securian's financial advising services.

97.     As a result of Securian and Shurwest's promotions of financial advisory services and Securian and Shurwest's superior knowledge, skill, and resources, Securian and Shurwest became fiduciaries to Plaintiffs and the Class.

98.     Among the fiduciary duties owed to Plaintiffs and the Class were duties to avoid conflicts of interests with Plaintiffs and Class members; resolve conflicts in favor of Plaintiffs and Class members where conflicts arise; to always act in the best interest of Plaintiffs and the Class; to make full fair and accurate disclosure of all fact's material to the relationship and transactions with Plaintiffs and members of the Class.

99.     Securian duties to Plaintiff and Class members were, and are, non-delegable.

100.    Securian had a duty to Plaintiffs and members of the class not to sell, or allow its agents to sell, to Plaintiffs and class members the illegal FIP loan products.

101.    Securian was required by law to have procedures in place to ensure compliance with AML and BSA laws both for itself and to impose such procedures upon its agents and brokers.

102.    These regulatory imperatives which were placed upon Securian resulted in Securian's knowledge (if proper compliance procedures were implemented and followed) regarding the illegal FIP Products that were being offered in conjunction with SLIC and MLIC products and which were being used as premium financing vehicles.

103.    Securian had actual or constructive knowledge of the illegal FIP loan scheme and knew they were reaping consistent and unlawful profits from the scheme at the expense of Plaintiffs and the Class.

104.    Securian's acts and omissions constitute a breach of fiduciary duties owed to Plaintiffs and members of the Class.

105.   Securian's fiduciary breaches and participation in Shurwest's promotion and sale of FIP products was a proximate cause of the Plaintiffs and Class members' injuries.

106.   Shurwest provided substantial, knowing assistance to Securian in its breach of fiduciary duties.

107.   Shurwest recruited and solicited financial advisors to utilize Shurwest services and its insurance broker and agent facilities with Securian and recommended financial advisers to be appointed as Securian insurance agents pursuant to the Master Brokerage General Agency Agreements between Shurwest and MLIC and SLIC.

108.   Shurwest undertook to market to and educate Network Agents on how to influence Plaintiffs and Class members regarding the purchase of FIP products as a means of paying premiums for insurance issued by MLIC and SLIC. Shurwest received compensation for its financial services with respect to each class members' FIP linked IUL policies.

109.   In so acting, Shurwest had and took advantage of the opportunity to influence and thus assumed a fiduciary duty to Plaintiffs and the Class.

110.   Because Shurwest owed Plaintiffs and Class members a fiduciary duty, either directly, or as the agent of Securian, Shurwest was required to observe the utmost good faith toward Plaintiffs and Class members in all of its transactions in accordance with fiduciary standards of care, skill, and judgment.

111.   Shurwest knew, or had reason to know, that Plaintiffs and Class members placed their trust and confidence in Shurwest to counsel and inform Plaintiffs with respect to the FIP Products used to finance their life insurance policies.

112.   Shurwest also knew that it had the opportunity to influence Plaintiffs and the Class through its education of Network Agents.

113.   Shurwest, through its officers, employees, and agents breached the fiduciary duty it owed to Plaintiffs and Class members in numerous ways, including, without limitation, failing to properly vet the FIP Products while claiming that it had done so; failing to supervise

its employees and/or agents regarding the sale of FIP Products; failing to disclose material facts about the FIP Products to Plaintiffs, Class members, Network Agents, and other broker/agents, including that the FIP Products were part of an illegal loan scheme; failing to provide Plaintiffs and Class members with undivided loyalty; failing to disclose at relevant times that the FIP Products were deteriorating as "investments" and could no longer sustain the premium payments on Plaintiffs' and Class members' life insurance policies; continuing to structure, market, and facilitate the sale of FIP Products to finance Plaintiffs and Class members' life insurance policies despite knowledge that the FIP Products were part of an illegal loan scheme; and acting in bad faith, with negligence, gross negligence, willful misconduct, and/or reckless disregard of its duties.

114.   Securian was in a fiduciary relationship with Plaintiffs and the Class and were in a superior position over the Class which required Class members to repose trust and confidence in the Network Agents who were operating on Securian's behalf.

115.   Shurwest knew that Securian had fiduciary duties to Class members and knowingly participated in the breach of those duties, rendering substantial assistance, and causing harm to Plaintiffs and the Class.

116.   Specifically, as the agent for Securian, Shurwest educated and marketed to the Network Agents the FIP Products as a legal and appropriate way for clients of the agents and brokers to finance the purchase of Securian life insurance policies. The agents and brokers looked to Shurwest, an IMO, for product education, marketing, and distribution services with regard to the Securian life insurance policies and the information provided by Shurwest aided and abetted breaches of Securian fiduciary duties by promoting the sale of illegal FIP Products in conjunction with Securian life insurance policies.

117.   At all times, Shurwest was the agent for Securian, and thus Shurwest participated in, and provided substantial assistance to, Securian's breaches.

CLASS ACTION COMPLAINT

118.    Shurwest's assistance was a proximate cause of the breaches. Without Shurwest's assistance, Shurwest Broker Network would not have even known to sell the FIP Products in conjunction with Securian life insurance policies, much less promote them as a legitimate vehicle for financing premiums.

119.    As a result of Shurwest's aiding and abetting this breach of fiduciary duty, Class members lost millions of dollars.

120.    Quantum is Shurwest's successor and alter/ego.

121.    In February 2019, Shurwest began rebranding itself as Quantum. Shurwest employees' email signatures included references to Quantum, Shurwest employees answered the phone on Quantum's behalf, and Shurwest President and Quantum owner Ron Shurts used "Shurwest/Quantum" to refer to one entity in email correspondence with Minnesota Life.

122.    On information and belief, Quantum occupies the same office space as Shurwest, employs the same employees as Shurwest, is managed by the same directors as Shurwest, and was set up as a successor entity to Shurwest. Accordingly, Quantum is an alter ego of Shurwest and/or the successor-in-interest to Shurwest for the wrongdoing alleged in this Complaint.

123.    Shurwest, in recognition of its liability exposure, and to preserver valuable Shurwest business relations that would transfer to Quantum, has settled several large exposures with large agents/broker entities doing big business with Shurwest. CMAM/Heritage Financial settled with Shurts/Shurwest for 86% of losses of CMAM clients. Shurwest/Shurts also made settlement payments to Horton Investment Management LLC.

124.    At all relevant times herein, Quantum was Shurwest's alter ego and/or successor-in-interest and thereby liable for the damages to Minnesota Life caused by Shurwest's negligence.

125.    At all material times herein mentioned, Quantum as the successor-in- interest to Shurwest is liable to Shurwest's wrongdoing through the equitable doctrine of de facto merger. Shurwest's business continued as Quantum, with the same employees, directors, officers,

business offices, telephones, and computers as Shurwest used in its business dealings. The creation of Quantum was a fraudulent transaction done in order to escape liability for Shurwest's obligations.

126.     Shurwest has damaged class members and Plaintiffs in a total amount to be determined at trial.

127.     Class members and Plaintiffs are therefore entitled to reach beyond Shurwest to the funds of Quantum for satisfaction of the amounts owed by Shurwest.

///

///

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment against the Defendants, as follows:

A.     Certifying the classes requested herein under Rule 23(b)(2) and/or (b)(3);

B.     Ordering compensation in an amount to be determined at trial, with additional damages, for all general, special, incidental, and consequential damages suffered by the Plaintiffs and the Class, as a result of the Defendant's liability for wrongful acts;

C.     Order disgorgement of all monies received by Defendant's as a result of sales of policies in connection with the illegal loan scheme;

D.     Awarding Plaintiffs and the Class their reasonable attorneys' fees and costs, to the fullest extent allowed by law; and

E.     Granting all such additional or further relief as this court deems just and equitable under the circumstances.

## VII.   **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  January 11, 2022            /s/ Hart L. Robinovitch
                                                 Hart L. Robinovitch, AZ Bar No. 020910
                                                 ZIMMERMAN REED LLP

CLASS ACTION COMPLAINT

14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ  85254
(480) 348-6400 Telephone
(480) 348-6415 Facsimile
hart.robinovitch@zimmreed.com

Daniel E. Gustafson (#202241)
Karla M. Gluek (#238399)
Amanda M. Williams (#341691)
Daniel J. Nordin (#392393)
**GUSTAFSON GLUEK PLLC** Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN  55402
Tel: (612) 333-8844
dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
awilliams@gustafsongluek.com
dnordin@gustafsongluek.com

Lee Squitieri (*pro hac vice*)
**SQUITIERI & FEARON, LLP**
424 Madison Avenue
New York, New York 10017
Tel: (212) 421-6492
lee@sfclasslaw.com

Kenneth A. Wexler (*pro hac vice*)
 Kara A. Elgersma (*pro hac vice*)
Melinda J. Morales (*pro hac vice*)
**Wexler Boley & Elgersma LLP**
55 W. Monroe Street
Suite 3300
Chicago, Illinois 60603
Tel: (312) 346-2222
kaw@wexlerwallace.com
kae@wexlerwallace.com

***Counsel for Plaintiffs and Proposed Class***

28

CLASS ACTION COMPLAINT